**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**RYANNE HARRIS,**                                    Case No. 1:18 CV 2142

      Plaintiff,

      v.                                               Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY**
**ADMINISTRATION,**

      Defendant.                                    MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Ryanne Harris ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny child's insurance benefits ("CIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 11). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for CIB and SSI in May 2015, alleging a disability onset date of September 1, 2006. (Tr. 265). Her claims were denied initially and upon reconsideration. (Tr. 199-204, 207-11). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 212-13). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on April 5, 2017. (Tr. 109-45). On August 28, 2017, the ALJ found Plaintiff not disabled in a written decision. (Tr. 96-103). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955,

404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on September 18, 2018. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Born in 1996, Plaintiff was nine years old on her alleged onset date, and twenty at the time of the ALJ hearing. *See* Tr. 115, 265. At the time of the hearing, Plaintiff lived with her mother and her younger sister. (Tr. 114-15). Plaintiff was a high school graduate, and attended college full time. (Tr. 115-16). She took twelve credit hours of classes, with four hours of classes per week on campus (three classes) and one online class. (Tr. 118). The online class took Plaintiff approximately three to four hours per week; in addition to classroom time, she spent three to four hours per week on each of her other three classes. (Tr. 119).

Plaintiff believed she was unable to work due to her chronic lupus and interstitial lung disease, specifically citing swelling in her fingers, wrists, knees, and feet, and shortness of breath with exertion or stress. (Tr. 120). Plaintiff experienced shortness of breath "almost every day . . . [e]ither just from stress or just walking." (Tr. 121). Physicians treated Plaintiff's lung disease with an immunosuppressant drug (Cellcept), which she testified prevented worsening, but she "still ha[d] symptoms." *Id.* Plaintiff explained that her symptoms arose when she "tr[ied] to do too much" or "because [she] tr[ied] to do what a normal person can do." (Tr. 122). Plaintiff explained that she could walk "about five minutes" on a flat surface, shorter on an incline. (Tr. 136-37). She also experienced shortness of breath due to stress while at rest. (Tr. 137).

Plaintiff's lupus caused swelling, more often in her fingers and hands than her knees and feet. (Tr. 122). She had pain and swelling in her hands and fingers almost daily, but "it also varies". (Tr. 123). The swelling made it more difficult to use a computer keyboard, button a blouse, or tie

shoelaces. (Tr. 135-36). Walking caused pain in her feet. (Tr. 123). Plaintiff took Prednisone for lupus, and underwent blood draws every three months to check her sedimentation levels to monitor inflammation. *Id.* Due to Raynaud's syndrome, Plaintiff's fingers and toes turned white or purple when cold or when she was stressed. (Tr. 123-24). Plaintiff's medications made her tired. (Tr. 138).

Plaintiff testified her mother did the grocery shopping, cooking, laundry, and housework; she was not responsible for any household chores. (Tr. 124-25). She spent five to six hours per week on her computer, primarily for schoolwork; she had social media, but did not spend much time on it because it was "stressful to look at the computer". (Tr. 125-26). Plaintiff spent most of her day sleeping, resting, or doing homework. (Tr. 126) ("I'm so tired just with school alone."). She sometimes had friends come over and watch television. (Tr. 127).

Plaintiff's college provided accommodations for her conditions, including a close parking spot and additional time to make up assignments due to illness. (Tr. 128). At the time of the hearing, Plaintiff did not have to walk between classes because all of her were in the same location. (Tr. 129). Plaintiff previously had courses in different locations and "[i]t was problematic and [she] had to drive from one building to the next[.]" *Id.* Plaintiff did not believe she could take all four classes on campus. (Tr. 134-35).

Plaintiff testified that her last "severe flare" was during her freshman year of high school. (Tr. 130). She had trouble breathing and spent a week or two in the hospital due to lung inflammation. (Tr. 131). She noted that her doctor said she had to slow down and eliminate extracurricular activities, including housework. (Tr. 131-32). Plaintiff's physician told her she could experience such a flare again at any time and that she should not work. (Tr. 132). Plaintiff experienced less severe flares "almost every week". (Tr. 133). A lupus flare could last "for a couple

of days" and a lung disease flare caused shortness of breath for "up to an hour or two." (Tr. 133-34). During lung exacerbations, Plaintiff had to sit or lie down. (Tr. 134).

Relevant Medical Evidence

According to treating rheumatologist Elizabeth B. Brooks, M.D., in 2006, Plaintiff developed swelling in her fingers and feet, followed by a fever and rash. (Tr. 470). She was ultimately diagnosed with connective tissue disease. *Id.* Shortly thereafter, Plaintiff had an inpatient hospital stay due to weakness and joint contractures; she was treated with steroids. *Id.* In 2007, a chest CT revealed interstitial changes and lymphadenopathy. *Id.* Later in 2007, a lung biopsy revealed interstitial lung disease with fibrosis and alveolar hemorrhage. (Tr. 471). Plaintiff continued daily oral steroids. *Id.*

An August 2011 chest CT showed "multiple areas of irregular linear hyperattenuation areas with ground glass opacification and bronchiectasis in peripheral and subpleural distribution", which was noted to be consistent with "nonspecific interstitial pneumonia which are often seen in connective tissue disorders." (Tr. 368). In March 2012, Plaintiff was hospitalized due to shortness of breath and found to have severe thrombocytopenia. *See* Tr. 376, 471. In August 2012, a chest CT revealed "minimal interval increase in irregular linear hyperattenuation, ground glass opacification, and bronchiectasis in peripheral and subpleural distributions throughout bilateral lungs, consistent with progressive interstitial lung disease." (Tr. 368). A treatment note states Plaintiff "received Cytoxan until about 2 years ago, and received monthly Pentamidine aerosols." (Tr. 383). At a September 2012 visit, Plaintiff denied acute shortness of breath with activity "though admit[ted] her activity tolerance overall continued to be quite diminished." (Tr. 376).

An August 2013 chest CT revealed "[n]o significant change" since the August 2012 CT scan, noting "[b]asilar predominant peripheral reticular interstitial opacities and groundglass opacities compatible with interstitial lung disease." (Tr. 389).

Plaintiff called her pulmonologist in November 2013 to describe symptoms of cough lasting ten days; he noted a probable respiratory infection and instructed Plaintiff to schedule an office visit, noting Plaintiff would likely need instruction regarding "use of Albuterol MDI and either Acapella or Flutter." (Tr. 374). At the visit, Plaintiff reported a cough lasting about ten days, but prior to that, no significant change in shortness of breath, cough, or activity limitation. (Tr. 369-70). She had a slight improvement in her cough over the prior five days. (Tr. 370). A chest x-ray revealed "interstitial reticular changes noted involving the mid to lower lungs with peripheral predominance"; these findings were "not definitely increased in comparison on the prior study and compatible with the prior seen interstitial changes of lungs." (Tr. 368). The physician noted Plaintiff's interstitial lung disease had "moderate to severe restrictive defect without significant change post bronchodilator" and that she had a "[w]orse exam with bibasilar crackles, recurrent cough and decrease in FEB1 and FVC compared to prior exam/studies." (Tr. 372). He also noted the "[a]cute decrease in PFT may relate to superimposed viral respiratory infection – no current fever or [chest x-ray] evidence of acute changes or infiltrates." *Id.* At a subsequent visit that month, Plaintiff's pulmonologist diagnosed lupus and interstitial lung disease, noting a "[m]oderate restrictive defect, but improved compared to last visit"; he also noted a "[r]ecent CT demonstrates persistence of linear hyperattenuation, ground glass opacification and bronchiectasis in peripheral and subpleural distributions through both lungs, consistent with progressive ILD." (Tr. 368-69). The physician also prescribed an Acapella mucus clearing device. (Tr. 373).

In July 2014, Plaintiff was prescribed an Albuterol inhaler. *See* Tr. 503. In August 2014, a chest CT showed "[b]ibasilar predominant reticular and groundglass opacities not significantly changed since 8/16/13 consistent with known interstitial lung disease." (Tr. 388).

In November 2014, Plaintiff saw pulmonologist Laura Milgram, M.D. (Tr. 444-47). Dr. Milgram noted she last saw Plaintiff in April of that year with a dry cough and "[s]ince then, she has been asymptomatic." (Tr. 444). She also noted Plaintiff's lupus "ha[d] been good; no flares" and she had "[n]o need for any breathing treatments since last visit." *Id.*

At an April 2015 visit with her rheumatologist, Elizabeth Brooks, M.D., Plaintiff "ha[d] been doing well and ha[d] been feeling well." (Tr. 472). She had no recent infections and her review of systems was negative. *Id.* Dr. Brooks noted she was "doing well symptomatically" though she "continue[d] to have marke[d] elevation of her sedimentation rate." (Tr. 478). Dr. Brooks ordered lab work, continued Plaintiff's medications, and instructed her to follow up in three months. *Id.*

At a May 2015 visit with Dr. Milgram, Plaintiff reported a cold a few weeks prior, which resolved, but her mother noted after her pulmonary function testing, her cough returned; she denied shortness of breath. (Tr. 439). It was noted that "[s]ince last visit on 11/4/14" Plaintiff had been "doing very well". *Id.* The physician noted: "Mom is very concerned that with the stress of nursing school, having to work during college may cause stress that could potentially cause exacerbations. Mom is hoping that if [Plaintiff] qualifies for SSI, it will allow her to not have to work while in school." *Id.* Plaintiff's pulmonary examination was normal. (Tr. 442). A spirometry test from this visit showed reduced FVC and FEV1, and the physician noted "[t]here is no significant change in pulmonary function since the last test on 11/3/14 when the FEV1 was 52% of predicted"; the results were "suggestive of restrictive disease." (Tr. 452). Dr. Brooks continued Plaintiff's

medications, and explained she could use her inhaler more regularly if her cough persisted. (Tr. 443). She noted that Plaintiff was "currently doing well" and that she "[a]gree[d] with plan for applying for SSI to potentially alleviate the stress of attending nursing school and trying to work with chronic illness." *Id.*

In July 2015, Plaintiff returned to Dr. Brooks. (Tr. 531-35). She reported "feeling well since her last visit" and denied recent illness. (Tr. 531). Plaintiff was concerned about her ability to travel between classes and requested a letter "with her diagnosis and limitations with regard to walking distances especially in colder weather while carrying her books", noting disability services would provide her a golf cart for transportation if she had such a letter. *Id.* She also reported she was "not using sunscreen on a daily basis and . . . that she avoids being outdoor during the daytime." *Id.* Dr. Brooks agreed to provide the letter, noting Plaintiff "ha[d] become more concerned about her disabilities related to her endurance and subsequent inability to go to and from class as rapidly as will be expected." (Tr. 535). Plaintiff's review of systems was negative (including denying cough, shortness of breath, or wheezing) (Tr. 532), and her physical examination was normal (Tr. 533).

In August 2015, Plaintiff underwent a chest CT which was "not significantly changed" compared to the August 2014 study. (Tr. 501). A spirometry study that same month showed Plaintiff's diffusing capacity of the lung ("DLCO") to be 61 percent of reference. (Tr. 514). This was noted to reflect a "[m]ild reduction in DLCO." *Id.*

Plaintiff returned to Dr. Brooks in October 2015, reporting an upper arm rash "resolved with weather change and less exposure to the sun" and swelling and redness in her right index finger which "resolved over the weekend." (Tr. 522). Plaintiff said school was going well. *Id.* She denied additional joint concerns, and recent illness. *Id.* Plaintiff's review of systems was negative,

and her physical examination was normal but for an upper extremity rash. (Tr. 522-24). Dr. Brooks noted Plaintiff "denie[d] symptoms to suggest active disease although she has continued to have elevation of her sedimentation rate." (Tr. 526). Dr. Brooks instructed Plaintiff to continue medications, take vitamin D to address a deficiency, undergo lab work, and follow up in January before returning to school. *Id.*

In January 2016, Plaintiff returned to Dr. Milgram, and was "[d]oing well since last visit". (Tr. 587); *see also* Tr. 591 ("is currently doing well"). She had "no problems" since her last visit, and no need for rescue albuterol. (Tr. 587). Dr. Milgram noted Plaintiff had a lupus flare in her fingers. (Tr. 588). She also had "some" exercise limitation and had not missed any days of school. *Id.* Her physical examination was normal. (Tr. 590). A spirometry study again showed reduced FVC and FEV1, but no significant change in pulmonary function since the previous test. (Tr. 592-93).

Plaintiff saw Dr. Brooks the following month. (Tr. 624-28). Plaintiff reported doing well and denied recent infections. (Tr. 624). Her review of systems was negative. *Id.* ("[She] denied fatigue although her mother has stated she is fatigued when she gets home from college. She is napping one day per week."). Plaintiff's physical examination was normal. (Tr. 626).

In April 2016, Plaintiff saw Dr. Brooks for a cough and nasal congestion. (Tr. 615). Dr. Brooks noted no joint swelling or synovitis on physical examination, and an otherwise normal physical examination. (Tr. 617). She believed Plaintiff's symptoms to be viral. (Tr. 621).

Plaintiff saw Dr. Brooks again the following month, at which time she denied joint concerns. (Tr. 608). She also reported that her medication compliance had improved, and that but for the cold in April, she had been healthy. *Id.* Plaintiff completed her college year and "plan[ned] to volunteer at Ahuja as a nonclinical nursing assistant." *Id.* On examination, Dr. Brooks noted a

rash on Plaintiff's right hand, but otherwise normal findings. (Tr. 610). Dr. Brooks noted "some of her labs demonstrate improvement; however, her ESR is much worse." (Tr. 613). Dr. Brooks noted she "had a long discussion with [Plaintiff] again today regarding the need for strict compliance with her medications and follow up." *Id.*

In September 2016, Plaintiff reported "that she ha[d] been feeling well". (Tr. 600). Dr. Brooks noted Plaintiff was "continuing to have issues with forgetting to take her evening medications." *Id.* Her review of systems was negative (Tr. 600) and her physical examination was normal (Tr. 602). Dr. Brooks noted she was "feeling well" and "ha[d] continued to have elevated inflammatory markers but is not taking all doses of Cellcept due to issues remembering her evening medication dose." (Tr. 606).

In January 2017, Plaintiff saw Dr. Brooks for follow up. (Tr. 597-99). Dr. Brooks renewed Plaintiff's medications and instructed Plaintiff to follow up in three months. (Tr. 599). Dr. Brooks also instructed Plaintiff to follow up with Dr. Milgram, as she was last seen a year prior. *Id.*

At a February 2017 visit, Plaintiff saw a pulmonologist, and reported that since November 2013 "she states that she feels she has been doing well from a respiratory standpoint." (Tr. 638). She reported "no significant interval pneumonias or [upper respiratory infection] episodes." *Id.* Plaintiff reported good activity tolerance with "walking to and from class" as her primary activity. *Id.* She denied "specific limitation of any desired activity". *Id.* On review of systems, Plaintiff noted marked improvement in cough, shortness of breath, and exercise intolerance over the prior two weeks. *Id.* The physician opined that Plaintiff's interstitial lung disease resulted in "[m]oderate restrictive defect, but improved compared to last visit on Nov. 6th", "[n]o crackles or wheezing on chest exam today, no cough during visit", and "[i]nterval improvement in FEV1 and FVC." (Tr. 642).

*Opinion Evidence*

In June 2015, Dr. Brooks completed a medical assessment form and attached a letter. (Tr. 466-67, 470-71. She noted Plaintiff's diagnoses of lupus/mixed connective tissue disease, and interstitial lung disease, and that she had treated Plaintiff since January 2006. (Tr. 466). She opined that "due to her disease" Plaintiff would "be unable to work and attend college simultaneously." (Tr. 467). This was so because she required enough sleep and rest "so she can participate fully in class/homework." *Id.* Dr. Brooks noted Plaintiff "plans to become a nurse and will be unable to do so if her disease flares secondary to inability to obtain adequate rest and increased stress of having to support herself through college and well as perform in college at a level that will be required to enter the nursing program." *Id.* In her letter, Dr. Brooks detailed Plaintiff's treatment history and noted she "continue[d] to have significant elevation of her sedimentation rate" and "chronic interstitial lung disease with abnormal pulmonary function tests that reveal moderate restriction with a severe diffusion defect." (Tr. 470-71). She noted that Plaintiff "would ultimately like to be functioning member of society with a full time nursing position" but that "[i[f she is unable to get through college, she will become dependent upon the disability program long term." (Tr. 471). In conclusion, she explained:

> Ryanne is a patient who is deserving of disability at this time due to her inability to hold down a job while trying to get through college. Her disease is at risk of a significant flare if she is forced to do so and she would ultimately be unable to complete college if she should have a serious flare. She has had life threatening flares previously and is at risk of doing so in the future if she is not given the opportunity to care for herself correctly.

*Id.*

In August 2015, State agency physician Anton Freihofner, M.D., reviewed Plaintiff's records and offered an opinion about her functional abilities. (Tr. 167-70). He opined Plaintiff could occasionally lift or carry twenty pounds, and frequently carry ten; she could stand and or

walk for six hours in an eight-hour workday, and sit for the same. (Tr. 167). He opined she should avoid concentrated exposure to extreme temperatures and pulmonary irritants. (Tr. 167-68).

In November 2015, State agency physician Rannie Amiri reviewed Plaintiff's records and affirmed Dr. Freihofner's opinion regarding Plaintiff's ability to lift, carry, sit, stand, or walk, but added the following postural limitations: occasionally crawling and climbing ramps, stairs, ladders, ropes, or scaffolds; frequently stooping, kneeling, or crouching. (Tr. 181-82). He also opined Plaintiff should avoid concentrated exposure to pulmonary irritants, but found her unlimited in her ability to be exposed to extreme temperatures. (Tr. 182)

In January 2017, Dr. Brooks wrote a "to whom it may concern" letter to Plaintiff's college. (Tr. 631). It stated:

> Ryanne has systemic lupus erythematosus/mixed connective tissue disease with interstitial lung disease. Because of her lung disease, her endurance is reduced. If she has to go long distances between classes, she will have difficulty getting to class on time. She has Raynaud's phenomenon which can cause decreased blood to the fingers and toes with cold exposure. She may also find that her joints are more painful during the cold weather months. She would benefit from access to a golf cart to go between classes for the above reasons. Ryanne is on medications that suppress her immune system and put her at increased risk of infections, especially during the winter. If she becomes ill, she may need to miss school and may require additional time to complete missed work. Please feel free to contact me if you require further information. Thank you for your assistance in helping to make Ryanne's life in college easier.

*Id.*

VE Testimony

A VE appeared and testified at the hearing before the ALJ. (Tr. 85-89) The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and residual functional capacity ("RFC") as ultimately determined by the ALJ. (Tr. 141). The VE responded that such an individual could perform jobs such as cashier or cashier II, ticket seller, or furniture rental clerk. (Tr. 141-42).

Upon questioning from Plaintiff's attorney, the VE testified that if the individual could only perform sedentary work with occasional handling, fingering, and feeling, there would not be jobs available. (Tr. 142-43). Further, the VE testified adding two additional twenty-minute breaks per day, being off-task more than 15 percent of the day, or missing two days of work per month would be work-preclusive. (Tr. 143).

ALJ Decision

In her August 28, 2017 written decision, the ALJ found Plaintiff had not attained age twenty-two as of her alleged onset date, and had not engaged in substantial gainful activity since her alleged onset date. (Tr. 98). She found Plaintiff had severe impairments of chronic pulmonary insufficiency, systemic lupus erythematosus, undifferentiated and mixed connective tissue disease, Raynaud's syndrome, and obesity, but that these impairments did not meet or medically equal the severity of a listed impairment. *Id.* The ALJ then set forth Plaintiff's RFC:

> [T]he claimant has the [RFC] to perform the following: lift/carry/push/pull twenty pounds occasionally and ten pounds frequently, stand/walk six hours and sit six hours of an eight-hour workday, occasionally climb ramps, stairs, ladders, ropes, or scaffolds, frequently stoop, kneel, or crouch, occasionally crawl, and is limited to frequent exposure to fumes, odors, dusts, gasses, poor ventilation, and extreme cold.

(Tr. 99). The ALJ then found Plaintiff had no past relevant work, but considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (Tr. 102). Therefore, the ALJ found Plaintiff not disabled. (Tr. 103).

**STANDARD OF REVIEW**

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises a single challenge to the ALJ's decision – she asserts the ALJ violated the well-known treating physician rule in her evaluation of Dr. Brooks's opinion. In conjunction, she asserts the ALJ erred in assigning more weight to Dr. Freihofner's opinion than to Dr. Brooks's opinion, when the former had no treatment relationship with Plaintiff and only reviewed her records.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188.[1] A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques;

---

1. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819. Plaintiff filed her claim in May 2015 and thus the previous regulations apply.

and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, she must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

In this case, the ALJ set forth her consideration of Dr. Brooks's opinion:

Treating rheumatologist, Elizabeth Brook[s], M.D., PH.D., noted that the claimant is primarily limited by her lung disease (Exhibit 6F at 3-8). She also concluded that the claimant is not able to work and attend college at the same time and that she experiences reduced endurance (Exhibit 19F). I give some weight to the conclusions of Dr. Brook[s]. While she is a treating source and noted moderate lung restriction with a severe diffusion defect as support for her conclusions, her examinations have been essentially normal (Exhibits 6F at 11, 12F at 9, 13, and 16, and 17F at 17 and 33). In fact, in February 2017, the claimant reported to another

treating source that walking to a[nd] from class was her primary physical activity, but reported no limitation in her ability to do so (Exhibit 21F at 1). I also note that Dr. Brooks concluded that the claimant experiences no mental limitations (Exhibit 18F). I give great weight to this conclusion as there is no evidence or allegations of mental impairment or limitations.

(Tr. 101).

Here first, the ALJ recognized Dr. Brooks's status as a treating physician, one factor under the regulations. *See* 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1). Second, she cited the consistency of Dr. Brooks's opinion with her own treatment notes, a factor to be considered under the regulations. 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give that medical opinion"). Plaintiff takes issue with the records cited by the ALJ, arguing that the ALJ erred in describing them as "essentially normal." (Doc. 13, at 14). But, for the reasons discussed below, the undersigned finds the ALJ's description of these records – found at Tr. 474, 526, 530, 533, 610, and 626 – a reasonable one.

In the first cited treatment note, from April 2015, Plaintiff argues the ALJ did not recognize that Dr. Brooks identified Plaintiff's sedimentation rate as highly elevated "suggestive of active inflammation". (Doc. 13, at 14). This is an accurate description of a comment made by Dr. Brooks in this record (*see* Tr. 478), but in the physical examination portion of the record, Dr. Brooks noted normal findings, including clear lungs, full range of motion in all joints without erythema, warmth, swelling, or active synovitis, and full motor strength (Tr. 474). At this same visit, Plaintiff reported "she has been doing well and has been feeling well" and denied recent infections, joint problems, or rashes. (Tr. 472).

In the second cited treatment note, from October 2015, Plaintiff contends the ALJ again failed to recognize Dr. Brooks's concern about Plaintiff's elevated sedimentation rate. However,

Dr. Brooks's full statement was: "She denies symptoms to suggest active disease although she has continued to have elevation of her sedimentation rate." (Tr. 526). Plaintiff secondly states that "[t]he same examination also discusses recent swelling in both of [Plaintiff's] hands, and an active rash with scabbed popular lesions on her arms." (Doc. 13, at 14) (citing Tr. 522, 526). But these pages contain notes from Dr. Brooks stating:

> Rash to upper arms resolved with weather change and less exposure to sun. She reports swelling of her right index finger on 10/15 with associated redness to her fingertip and warmth to her finger. Her symptoms resolved over the weekend. She denies known injury to the finger. She denies additional joint concerns, redness, warmth or swelling. She denies morning stiffness.

(Tr. 522). Dr. Brooks noted on examination that Plaintiff had "papular lesions on the upper extremities bilaterally with scabbing". (Tr. 526). However, the remainder of Plaintiff's physical examination was normal, including full range of motion in all joints without swelling. *Id.*

In the third treatment note cited by the ALJ, from July 2015, Plaintiff argues the ALJ failed to discuss Plaintiff's reported concern about making it to class on time and that she avoided being outside due to her lupus. (Doc. 13, at 14). But these are Plaintiff's subjective reports, rather than findings by Dr. Brooks. *See* Tr. 531 ("She is not using sunscreen on a daily basis and informs that she avoids being outdoor during the daytime"; "She reports concern that she will not be able to make it to classes on time carrying her bookbag due to distance between classes. She is requesting a letter with her diagnosis and limitations with regard to walking distances especially in colder weather while carrying her books."). Moreover, Plaintiff's avoidance of being outside appears to be noted in response to a question about whether she was wearing sunscreen regularly, and is not a finding that she is unable to be outdoors. *See id.* Although Dr. Brooks agreed to write the requested letter (Tr. 535), her examination findings at this visit were again mostly normal, *see* Tr.

533 (clear lungs, full range of motion in all joints without erythema, warmth, swelling, or synovitis).

Plaintiff also argues the ALJ failed to acknowledge, in a cited treatment note from February 2016, that Plaintiff's "mother was concerned about her being fatigued after she came home from the classes when she had to attend in person at Ursuline College." (Doc. 13, at 14-15). Again, this is an accurate description of Dr. Brooks's report of Plaintiff's mother's report. *See* Tr. 624. But again, Dr. Brooks's objective findings at this visit were normal (Tr. 626) and Plaintiff reported "feeling well" (Tr. 624).

Plaintiff also cites a treatment note not cited by the ALJ in evaluating Dr. Brooks's opinion, noting that in April 2016, she had nasal congestion, cough, and yellow sputum. (Doc. 13, at 14) (citing Tr. 615). But Dr. Brooks opined this was "likely viral". (Tr. 621). And indeed, at her appointment the following month, Dr. Brooks noted Plaintiff "was sick in late April with a cold but has otherwise been healthy." (Tr. 608). Additionally, it is the examination at this follow-up visit that the ALJ correctly cites as one of those that is "essentially normal." (Tr. 101) (citing, *inter alia*, Tr. 610). Indeed, at this visit, Plaintiff had finished the school year and planned to volunteer as a nursing assistant. (Tr. 608). Additionally, except for a rash on her right hand, her physical examination was normal. (Tr. 610) (lungs clear; full range of motion in all joints without erythema, warmth, swelling, or active synovitis). Thus, the undersigned finds no error in the ALJ's description of the cited records from Dr. Brooks as "essentially normal." (Tr. 101).

Next, the ALJ addressed Plaintiff's February 2017 report to Dr. Carl that "walking to a[nd] from class was her primary physical activity" and that she "reported no limitations in her ability to do so". (Tr. 101) (citing Tr. 638). Indeed, Dr. Carl noted: "She feels she has good activity tolerance – walking to and from class is her primary activity – and denies any specific limitation

of any desired activity." (Tr. 638). This supports the ALJ's conclusion that Plaintiff was less limited than opined by Dr. Brooks. 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give that medical opinion").

Plaintiff contends these are not good reasons, and that "[t]o the contrary, the records reinforce the core of the medical opinion regarding [Plaintiff's] functional capacity – that the claimant's pulmonary and autoimmune system deficiencies preclude [Plaintiff's] ability to work a full time job." (Doc. 13, at 15) (citing Tr. 439, 444, 470, 471). Further, she asserts that "[r]ecords show a heavily reduced breathing capacity, and poor sedimentation rates (citing Tr. 425, 478, 526, 592), and that "[e]ven with a minimal amount of activity required to attend four hours of class per week at Ursuline College, Plaintiff still evidences symptoms of fatigue, chronic swelling, and shortness of breath." (citing Tr. 146-48, 535, 625). (Doc. 13, at 16). To be sure, there is evidence in the record that supports Dr. Brooks's opinion. But the undersigned must affirm if substantial evidence also supports the ALJ's decision. *Jones*, 336 F.3d at 477. Substantial evidence supports the reasons provided by the ALJ to discount Dr. Brooks's opinion, and those reasons satisfy the regulatory requirement.

Finally, Plaintiff contends that the ALJ erred in assigning more weight to the opinion of State agency reviewing physician Dr. Freihofner. She argues that the ALJ erred as she "erroneously favored Dr. Freihofner's medical opinion over Dr. Brook[s]'s even as he had never examined or treated her, the rest of the medical evidence undermines his conclusions, and he lacks specialization in the medical fields that study and treat [Plaintiff's] impairments." (Doc. 13, at 18-19). The ALJ considered Dr. Freihofner's opinion (in conjunction with Dr. Amiri's opinion on reconsideration):

Anton Freihofner, M.D., evaluated the claimant's physical condition based on the evidence of record without examining the claimant on behalf of the DDD on August 21, 2015 (Exhibit 1A). Dr. Freihofner concluded that the claimant is capable of light exertion work, but must avoid concentrated exposure to extreme temperatures, fumes, odors, dusts, gases, and poor ventilation. This assessment was essentially affirmed upon reconsideration except for the addition of occasional climbing of ramps, stairs, ladders, ropes, or scaffolds, frequent stooping, kneeling, or crouching, occasional crawling, and no limitations for exposure to temperature extremes (Exhibit 5A). I give great weight to the conclusions of the evaluating sources as they are consistent with the weight of the objective evidence of record, which documents limited exertional capabilities related to connective tissue disease complicated by interstitial lung disease. However, physical examinations have been essentially normal except for occasional notations of a hand rash. As a result, the claimant is limited to light exertion work. In addition, due to some limitations in pulmonary functioning, exacerbated by obesity, the claimant is limited to occasional climbing of ramps, stairs, ladders, ropes, or scaffolds, frequent stooping, kneeling, or crouching, and occasional crawling[.] In order to avoid exacerbating her lung disease, the claimant should also avoid more than frequent exposure to fumes, odors, dusts, gases, poor ventilation, and extreme cold.

(Tr. 101).

Ascribing more weight to a non-examining physician over an examining or treating physician is not *per se* error. *See, e.g., Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433 439 (6th Cir. 2012) ("Any record opinion, even that of a treating source, may be rejected by the ALJ when the source's opinion is not well supported by medical diagnostics or if it is inconsistent with the record.") (citations omitted); *see also Brooks v. Comm'r of Soc. Sec.,* 531 F. App'x 636, 642 (6th Cir.2013) (observing that in some circumstances, opinions from State agency medical consultants may be entitled to greater weight than the opinions of treating or examining sources) (citing SSR 96–6p, 1996 WL 374180, at *3); SSR 96–6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."). State agency medical consultants are "highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under

the [Social Security] Act." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016) (first alteration in original) (internal quotation marks omitted); *see also Hoskins v. Comm'r of Soc. Sec.*, 106 F. App'x 412, 415 (6th Cir. 2004) ("State agency medical consultants are considered experts and their opinions may be entitled to greater weight if their opinions are supported by the evidence.").

The ALJ in this case reasonably determined the State agency opinions were consistent with and supported by the record evidence – which, as the ALJ discussed (Tr. 100-01) – contained numerous normal findings and a stable condition. And, as discussed above, the ALJ provided the regulatory-required "good reasons" for discounting the opinion of Dr. Brooks.

Thus, the undersigned finds Commissioner's decision is supported by substantial evidence. Even though Plaintiff would weigh the medical opinions differently, it is not this Court's place to reweigh the evidence. Even if a contrary finding would also have been supported by substantial evidence, the Court must affirm the Commissioner's decision where the evidence supports it. *Jones*, 336 F.3d at 477.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying CIB and SSI supported by substantial evidence and affirms that decision.


 s/ James R. Knepp II
United States Magistrate Judge